**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| HEATHER SAMPLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-cv-4161-JPG |
| | ) | |
| REND LAKE COLLEGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM AND ORDER**</u>

**GILBERT, District Judge:**

This matter comes before the Court on Defendants' Motion for Summary Judgment. (Doc. 29). After Defendants' Motion was filed, this Court granted Plaintiff Heather Sample ("Sample") leave to file an amended complaint. Sample filed her amended complaint on June 17, 2005 (Doc. 31) and Defendants responded by filing their Supplemental Brief in Support of their Motion for Summary Judgment. (Doc. 33). This brief included arguments in support of summary judgment on the new claims raised in Sample's amended complaint. Plaintiff responded to Defendants' Motion (Doc. 38) and Defendants, in turn, replied. (Doc. 52). For the reasons discussed below, Defendants' Motion will be GRANTED in part and DENIED in part.

    **I.**    **Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must

construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396. This standard is applied with special scrutiny in cases, such as employment discrimination cases, that often turn on issues of intent and credibility. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas*, 209 F.3d at 692. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

## II.    Background

Construing the evidence in the light most favorable to Sample, and drawing all reasonable inferences in her favor, the admissible evidence establishes the following facts.

Sample's employment with Rend Lake College ("the College") began on December 16,

1998, and ended with her termination on August 22, 2003 (Pl. Dep.15).  Sample was pregnant at the time of her termination, and whether this pregnancy and the possibility of her taking maternity leave motivated her termination is the subject of this dispute.  Sample began her employment as a Child Care Resource and Referral Financial Assistant until sometime in late January or early February of 2001, she received a promotion and became the co-manager of the College's  retail store (Pl. Dep. 16).  A series of 1-year contracts governed Sample's employment; the last contract covered  from July 1, 2002 to June 30, 2003 (Pl. Dep. 17).  No written contract governed her employment in August of 2003 (Pl. Dep. 17).  In addition, Sample received no assurances, written or verbal, that she would continue to be employed after the effective date of her contract, and her final contract contained language indicating that it did not imply continued employment after the effective its effective contract (Pl. Dep. 21, Pl. Dep. Ex. 3).

The parties do not dispute that Sample had a satisfactory employment history before August, 2003.  The problems arose, however, from the passage of a new dress code for employees of the College.  On August 12, 2003, Sample attended a meeting of the President's Council, conducted by the President of Rend Lake College, Mark Kern ("Kern"), where the College's proposed dress code policy was discussed.  (Pl. Dep. 39).  Among other things, the new policy specifically prohibited employees from wearing shorts (Pl. Dep. 40).  Those in attendance at the meeting received copies of the proposed dress code and were invited to ask questions about the policy (Pl. Dep. 40).  At this meeting Kern did not specifically instruct the attendees to comply with the proposed policy immediately, he simply assumed that as the attendees were either supervisors or employees having budgetary responsibilities, they would

conform to the administration's wishes "whether it was a policy or not." (Kern Dep. 13). Though Sample was aware that the proposed policy was to be voted on that evening by the Board of Trustees of Rend Lake College ("the Board"), she did not attend the meeting of the Board that evening, where the Board approved the policy (Pl. Dep. 41).

On August 13, 2003, Sample came to work wearing maternity shorts (Pl. Dep. 50). At approximately 8:00 a.m. that morning, the manager of the textbook store, Dorothy Feira ("Feira"), observed Sample wearing shorts, informed her she was not in compliance with dress policy and offered to watch her side of the store while she (Sample) went home to change (Feira Dep. 25-26). According to Feira, Sample became upset at this point and stated, "If they don't like it, they can send me home and I'll use my sick days until this kid is born." (Feira Dep. 26). Sample denies making this statement, but admits she did discuss the issue of sick leave with Feira. In any event, Sample did not go home to change. Later that morning Kern learned that Sample was wearing shorts to work in violation of the new policy, and sent Robert Carlock, Vice President of Finance and Administration ("Carlock"), and Mary Roe, Vice President of Student Services ("Roe"), to meet with Sample and investigate the situation (Kern Dep. 25). At this meeting, which took place at approximately 12:30 p.m., Carlock informed Sample that she was violating the College's policy by wearing shorts and told her to go home and change (Carlock Dep. 30). At this time, Sample requested an exemption from the dress code policy from Carlock because of her pregnancy and he immediately denied her request. Sample understood that Carlock wanted her to leave as soon as possible, but she felt she could not leave until her co-manager, Bobbi Shadowens ("Shadowens"), returned from lunch (Pl. Dep. 120-21). In any event, Sample did not leave the store until approximately 2:00 or 2:30 p.m, when Carlock saw

her leaving the school – still wearing shorts – and brought her to his office (Pl. Dep. 62-63, Carlock Dep. 32).  Carlock suspended Sample for two days for her dress code violation and told her to come back to work the following Monday wearing appropriate attire (Pl. Dep. 63, Carlock Dep. 34-35).  After Carlock suspended Sample, Carlock spoke with Feira and she relayed her version of her conversation with Sample regarding Sample's intention to use her sick days if the dress code policy were to be applied to her (Feira dep. 28).  Sometime later that day or the next, Carlock met with Kern and discussed the subject of Sample's suspension (Kern Dep. 34).  Carlock informed Kern of Sample's suspension, his conversation with her, and Feira's version of her conversation with Sample regarding Sample's supposed intention not to comply with the dress code by using her sick days (Kern Dep. 34-35).  Kern, particularly interested in Sample's statements to Feira, requested that Carlock get those statements from Feira in writing, which Carlock produced in the form of a memo written by her (Kern Dep. 36).

On August 18, 2003, Sample returned to work dressed in compliance with the dress code (Kern Dep. 42-43).  That afternoon, Sample met with Kern, Carlock and Roe in Kern's office to discuss Sample's actions on August 13th.  The conversation focused specifically on her violation of the dress code and her conversation with Feira regarding sick days (Pl. Dep. 68-69).  Kern told Sample that this was "the grossest form of insubordination that he had seen in his thirty-four years at the College."  (Pl. Dep. 70).  At the close of this meeting Kern suspended Sample and informed her that he planned to recommend her termination to the Board, which would decide whether to approve this recommendation at a special Board meeting later in the week (Pl. Dep. 70, 75-76).  Kern recommended Sample's termination because she failed to comply with the new dress code, failed to change when Feira offered to let her go home, her sick leave remarks to

Feira and her refusal to leave and change after Carlock told her to do so.  At the Board meeting, held on August 22, 2003, the Board met (all members were present via telephone) and considered Kern's recommendation that she be terminated (Kern Dep. 52-53).  Sample read a written statement to the Board and Kern presented his recommendation for termination; the Board declined to direct any questions toward Sample (Pl. Dep. 77, Kern Dep. 52-53).  Before the meeting Kern advised the Board not to engage in a dialog with Sample because of a fear of future litigation.  After meeting in closed session, the Board voted to approve Kern's recommendation that Sample be terminated (Pl. Dep. 78).  After the Board meeting Sample grieved her termination in accordance with the College's grievance policy (Pl. Dep. 92).

Shadowens took over Sample's responsibilities after her termination and continued to manage the retail store until she took FMLA leave for her pregnancy in mid-October (Pl. Dep. 100).  While Shadowens was on maternity leave, a non-pregnant female employee, Kathy Craig ("Craig") managed the store.  Shadowens resumed her position as co-manager after she returned from maternity leave until she voluntarily took a higher paying position within the College. After her transfer, Craig took over Shadowens' responsibilities (Shadowens Decl. ¶ 3, 5, 6).

### III.    Analysis

Plaintiff alleges Defendants are liable for (1) pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq, (2) interference with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., (3) retaliation for exercise of her rights under the FMLA, (4) breach of contract and (5) violations of due process pursuant to 42 U.S.C. § 1983.  The Court will address each of these claims in turn.

### A.    Pregnancy Discrimination under Title VII

Title VII prohibits discrimination on the basis of sex, and, firing an employee on the basis of her pregnancy is clearly within its scope.  42 U.S.C. § 2000e(k), 2000e-2(a)(1); *see Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1010 (7th Cir.1997). To withstand a motion for summary judgment in this type of case, a plaintiff may establish a case of sex discrimination in two ways.  First, a plaintiff may show that her termination was the result of intentional discrimination – the so-called direct method.  *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998).  Second, a plaintiff may establish discrimination using the indirect method – the burden shifting approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the direct method, a plaintiff may present direct proof of discrimination through direct or circumstantial evidence.  *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001);  *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 395 (7th Cir. 1998).   "Direct evidence is evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption."  *Miller v. Borden, Inc*., 168 F.3d 308, 312 (7th Cir. 1999) (internal quotations and citations omitted).  If the direct evidence consists of isolated statements made by the decisionmaker**,** those statements should be causally related to the decision-making process, for they are relevant to show such person's motivation in making the employment decision in question.  *Miller*, 168 F.3d at 312.  The Seventh Circuit has also stressed that such statements should be temporally related to a plaintiff's termination.  *See Kennedy*, 140 F.3d at 723 (finding a statement made five months prior to termination not temporally related to the discharge); *Geier v. Medtronic, Inc*., 99 F.3d 238, 242 (7th Cir.1996) (finding a statement made one year prior to termination not temporally related). Direct evidence "essentially requires an admission by the

decision-maker that his actions were based upon the prohibited animus." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000)).

At the outset, it is important to note that there is some question as to who the actual decisionmaker was in this case. In Title VII cases, the decisionmaker is the person responsible for the contested decision. *Rogers*, 320 F.3d at 754. The parties do not dispute that Kern recommended Sample's termination to the Board or that the Board approve the recommendation. However, Sample claims Kern and Carlock were the "real" decisionmakers and the Board merely rubber-stamped Kern's recommendation. For purposes of this claim, the Court will simply assume Carlock and Kern were the actual decisionmakers.

As direct evidence, Sample offers a statement made by Carlock at a staff meeting upon hearing of Sample's pregnancy. Carlock told Sample he had told Glenna Maxwell ("Maxwell"), the College's payroll and benefits accountant, " to get the FMLA book out and keep it out because there were so many pregnant women." (Pl. Dep. 103). This statement cannot serve as direct evidence of intentional discrimination. First, Carlock made this statement in February of 2003, six months before her eventual termination (Pl. Dep. 103). Thus, this statement was not temporally related to Sample's termination. Second, this statement is not causally related to the decision making process leading to Sample's termination. The statement, on its face, does not show discriminatory animus toward Sample specifically and does not remotely relate to the decision making process that led to her termination. Taking any more from this statement would require inference or presumption beyond that given to evidence proffered as direct evidence under the direct method.

Though Sample couches her arguments under the heading of direct evidence, an analysis of those arguments suggests that she seeks to prove intentional discrimination based upon circumstantial evidence under the direct method. Thus, Sample must point this Court to evidence from which a reasonable juror could infer Defendants unlawfully discriminated against Sample. In *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994), the Seventh Circuit distinguished three types of circumstantial evidence: first, evidence that when put together "compos[es] a convincing mosaic of discrimination," including suspicious timing, ambiguous statements, comments to other employees and other pieces of evidence from which an inference of discrimination can be drawn; second, comparative evidence, evidence which shows similarly situated individuals, individuals without whatever characteristic upon which the employer is allegedly discriminating, received systematically better treatment; and third, pretext evidence, evidence showing that plaintiff was qualified for the job but replaced by one without the discriminated upon characteristic, and the reason provided for the difference is unconvincing. Sample's argument is an amalgam of all three of these types of evidence.

In her response to Defendants' motion, Sample uses Carlock's statement (discussed above) as the cornerstone of her circumstantial evidence of discrimination. She asserts that this statement, when viewed in light of the fact that Carlock was aware of Sample's ability to take twelve weeks of paid leave, clearly supports the inference that Sample was terminated because of that pregnancy. Sample also emphasizes the her termination was the result of one incident. Sample also alleges the College uses a progressive disciplinary regime but offers as support portions of deposition transcripts not put before the court. Further, Sample argues the manner in which her position was filled after her termination discloses a calculated scheme to hide the fact

-9-

that the College fired her because she was pregnant.  Sample claims that Shadowens did not really "replace" her, rather, she merely took over her responsibilities, responsibilities she already had as co-manager.  Putting Shadowens in that position, Sample argues, was simply an artifice, when in fact her "real" replacement was a non-pregnant female, Kathy Craig ("Craig").  Sample claims she spoke with Carlock before she was transferred to the store and he told her Shadowens could not handle the store and was causing the store to receive complaints (Pl. Decl. ¶ 8).  Sample reasons Shadowens could not have been a "real" replacement, as the administration, i.e., Carlock, felt she was incapable of handling the job.  Sample also places great emphasis on the fact that Kern did not investigate the incident giving rise to Sample's termination .

Sample's arguments are not persuasive.  One might reasonably infer that Carlock's statement evidenced some frustration with the number of pregnant women at the college – in 2003, eight of the seventy-six support staff became pregnant (excluding Sample) and all eight were granted leave under FMLA.  (Def. Ans. Interr. 5).  However, Sample points to no other evidence to suggest that Carlock's frustration, six months prior to Sample's termination, played any part in the process that led to the eventual decision.  The statement, on its face, suggests not a willingness to fire an employee because of a pregnancy, but a resignation to the fact that the FMLA eligible pregnant employees must be given leave.  Though expressing such resignation in the manner he did probably showed insensitivity to the needs of pregnant employees, one cannot reasonably infer unlawful discriminatory animus from such a statement.

Sample draws a perilously fine distinction between replacing an employee and taking over an employee's responsibilities.  In any case, Sample's assertion that Shadowens did not take on new responsibilities flies in the face of Sample's own declaration that after she moved to the

-10-

retail store Shadowens was to report to her, and that one of her responsibilities was "to make sure [Shadowens] did her job." (Pl. Decl. ¶ 12, 15).  It is undisputed that before Sample's termination two people managed the retail store.  After Sample's termination Shadowens had that responsibility to herself for nearly two months, until she went on maternity leave in mid-October.  In the end, a pregnant women who intended to, and subsequently did, take maternity leave under the FMLA ran the store after Sample was fired.  Such evidence simply cannot support a reasonable inference that Sample was terminated because she was pregnant.  Sample's assertion that Kern did not investigate the events of August 13, 2003 is similarly unfounded. After Carlock initially suspended Sample on August 13th he met with Kern and discussed the incident.  After hearing about Sample's alleged remarks regarding sick leave, Kern directed Carlock to get this information in writing, which he did in the form of a memorandum from Feira.  On the 18th, Kern met with Carlock, Roe and Sample and discussed Sample's actions before he told her he was recommending her termination.  It is not clear just what sort of investigation Sample would have had Kern undertake.  Requesting written conformation of the remarks which so stirred his ire certainly seems like a reasonable move.  Similarly, calling Sample into his office, by Sample's own admission, gave her some opportunity to offer support or a defense for her actions. Perhaps Kern should have done more, perhaps not.  However, what investigation he did do, or, more precisely what he did not do, could not lead a reasonable jury to conclude that Sample was fired on the basis of her pregnancy.

In the end it is not what each fact or argument taken piecemeal shows, but whether the evidence, when put together, suggests pregnancy discrimination.  Sample has presented sufficient evidence from which a jury could reasonably infer she was punished too harshly.  A

-11-

jury might even find the reasons given for Sample's termination were pretextual.  However, this harsh punishment or even pretext do not support an inference of pregnancy discrimination. People are fired for any number of reasons.  The simple fact that a pregnant woman was fired does not automatically mean the pregnancy was the cause for termination.  Whatever reservations the Court might still have on the reasonableness of an inference of pregnancy discrimination are assuaged by the College's treatment of the other pregnant employees that year.  As the Court previously noted, of the seventy-six employees fitting roughly into Sample's employment category, nine (including Sample) were pregnant in 2003.  The College granted *paid* FMLA leave, at least in part, to all of the employees except Sample (Carlock Decl. ¶5-7). Carlock approved the leave of five of those eight employees.  Also, five of those eight employees are currently employed by the college, and the other three that left did so voluntarily. Sample has not presented any evidence whatsoever to show unlawful pregnancy discrimination by Kern.  Sample has failed to come forward with sufficient circumstantial evidence to support an inference of discrimination under the direct method.

Sample also proceeds under the indirect method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this approach, she must first establish a prima facie case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action and (4) she was treated less favorably than others not in the protected class who were similarly situated.  *Ajayi v. Aramark Bus. Servs.*, 336 F.3d 520, 531 (7th Cir. 2003).

Sample was pregnant at the time of her termination.  Thus, she easily meets two of the

elements of the prima facie case: she is a member of a protected class and she suffered an adverse employment action.  To meet her prima facie case, Sample must also show she was treated less favorably than similarly situated individuals who were not in her protected class. Employees are similarly situated if they are "directly comparable . . . in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  Those "material respects" depend on the facts of the case and may include whether the employees dealt with the same supervisor, were subject to the same standards, or had comparable experience, education and qualifications, if the employer took these factors into account when making the personnel decision in question.  *Id.*  In disciplinary cases, where, as here, a plaintiff claims she was disciplined more harshly than similarly situated coworkers, a plaintiff must show she was similarly situated with respect to performance, qualifications and conduct, without mitigating or differentiating circumstances which would explain the disparity in treatment.  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) (citing *Byrd v. Ronayne*, 61 F.3d 1026, 1032 (1st Cir.1995)).  "Different employment decisions, concerning different employees, made by different supervisors . . . sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination." *Radue*, 219 F.3d at 618.

Sample claims Michelle Garrett, Tara Sullivan and Nina Gaspar (all non-pregnant employees) committed similar violations of the dress code yet went unpunished.  For purposes of this discussion the Court will assume these women violated the dress code and went unpunished. Such facts are insufficient to show these employees were similarly situated.  Garratt worked in the College's counseling department as a career counselor, Gaspar worked in the College's IT department as a programmer and Sullivan worked in the Student Services department as a

learning enhancement specialist (Carlock Decl. ¶¶ 11, 13, 15).  These positions were not managerial and these women were not supervised by Carlock or Kern (Carlock Decl. ¶¶ 12, 14, 16; Kern Decl. ¶¶ 3, 4, 5) Further, neither Carlock nor Kern were aware of any of these violations.  Plaintiff neither disputes these facts nor offers any other evidence of similarity.  Thus, Sample has failed to make out the third element of her prima facie case and this Court need proceed no further.  Because Sample has not succeeded under the direct or indirect methods Defendants' motion with respect to Sample's pregnancy discrimination claim is **GRANTED** and this claim is therefore **DISMISSED with prejudice**.

## B. Interference with Substantive Rights under the FMLA

The FMLA provides eligible employees of certain employers with substantive rights.  It provides up to twelve weeks of leave during a year for, among other things, the birth of a child. 29 U.S.C. §2612(a)(1)(A).  To protect this right and others, it is unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the FMLA. 29 U.S.C. § 2615(a)(1); *Thomas v. Pearle Vision, Inc.*, 251 F.3d 1132, 1139 (7th Cir. 2001).  As further protection, the FMLA prohibits an employer from discharging or otherwise discriminating against an employee for exercising her rights under the FMLA.  29 U.S.C. § 2615(a)(2).  Thus, employees can obtain relief under the FMLA in two ways: (1) establishing a deprivation of a right guaranteed by the FMLA and (2) establishing discrimination based upon the exercise of rights under the FMLA.  *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999).  In Count II Sample claims Defendants deprived her of her right to take FMLA leave, and in Count III she claims Defendants discriminated against her for requesting FMLA leave.

-14-

In Count II, Sample alleges the College denied her right to take leave under the FMLA by firing her before she actually became entitled to exercise the right (i.e., before she actually took leave for her pregnancy).  Clearly, this situation is covered by § 2615(a)(1), for it would be absurd to require an employee to notify her employer in advance of future leave if the employer could simply fire the employee in the interim, thereby relieving itself of the duty to afford the employee leave.  Having established this situation as one covered under the FMLA, the Court must determine whether Defendants deprived Sample of her substantive right.

When an employee alleges a deprivation of the substantive guarantees provided by the FMLA, the employee bears the burden, by a preponderance of the evidence, of establishing that she is entitled to the benefit she claims.  *King*, 166 F.3d at 891.  In some circumstances, the employee must do more than simply set forth the required elements of the statutory scheme.  For example, where an employee claims an entitlement to return to her previous position after taking FMLA leave, the employer is entitled to present evidence "to show that the employee would not have been entitled to her position even if she had not taken leave."  *Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir. 2001); 29 C.F.R. § 825.216(a)(1).  When the employer presents such evidence, the plaintiff's burden does not change.  However, the plaintiff must first show that her employer "would not have discharged her had she not taken FMLA leave" to show her entitlement to be reinstated.  *Kohls*, 259 F.3d at 804.  In finding that Kohls failed to meet her burden the Court made it clear that "an employee may be fired for poor performance when she would have been fired for such poor performance even absent her leave." *Id.*  Structuring the burden this way certainly makes it more difficult for a plaintiff to prove her substantive entitlement.  *See Rice v. Sunrise Express, Inc.*, 217 F.3d 492, 493 (7th Cir. 2000)

(Wood, J. dissenting from denial of reh'g en banc).  However, the Seventh Circuit has repeatedly found that burden appropriate. *See, e.g., Kohls*, 259 F.3d at 806; *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1018 (7th Cir. 2000).  Though *Kohls* and *Rice* deal with a slightly different issue under the FMLA, Sample's burden is still the same.  Thus, in order to show her entitlement to maternity leave, Sample must first show that she would not have been fired had she not given notice of her intention to take leave.  It is important to note at this point that requiring Sample to prove she would not have been fired if she had not requested leave is not the same as requiring Sample to prove the College's reason for her termination was pretextual. The FMLA does not provide an employee a remedy if she can prove the actual reasons for her termination were different from those given by an employer.  The FMLA provides a remedy if an employer fires an employee in order to preclude her from taking leave guaranteed under the FMLA.

As a threshold matter to the deprivation issue, this Court must determine if Sample gave the notice required under the FMLA, for if she did not, she cannot show her entitlement to its substantive guarantees.  For leave that is foreseeable, such as leave necessitated by the birth of a child, the employee must notify her employee at least 30 days prior to the date she plans to take leave.  29 U.S.C. § 2612(e)(1). The notice requirement under the FMLA is not especially strict. An employee need not mention the FMLA by name; in fact, all that is required is that the employee provide the employer with enough information to put the employer on notice that FMLA-qualifying leave is needed.  *Stoops v. One Call Commc'ns, Inc.*,141 F.3d 309, 312 (7th Cir. 1998).  Sample claims she told Carlock she was pregnant and she intended to take twelve weeks of leave at a staff meeting in February of 2003.  Defendants claim she did nothing more at that meeting than publically announce her pregnancy, and regardless, she never specifically

-16-

requested leave under the FMLA.  Sample also claims she contacted Maxwell regarding her pregnancy and FMLA leave.  Clearly, Sample's failure to mention the FMLA by name has little bearing on this inquiry.  Based on her communications with Carlock and Maxwell , a jury could reasonably find Sample gave sufficient notice under the FMLA. At the very least, Sample has shown a genuine issue of material fact on the sufficiency of the notice. *See Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir. 1997).  This does not, however, end the Court's inquiry.  Assuming Sample gave the requisite notice, Sample must still show that she would not have been fired had she not requested leave.

Sample claims the reasons given for her termination were pretextual because her conduct did not merit termination. Though such a claim is not the key inquiry under this analysis, the Court will construe this as an argument that she would not have been fired had she not requested leave.  Defendants counter by claiming they must retain the right to terminate an employee for cause after being put on notice of expected leave.  Accordingly, they claim they had the right to terminate her for her insubordination: namely, coming to work in violation of the dress policy, not going home when given the opportunity by Feira, telling Feira she would use her sick days if forced to comply with the policy (Sample disputes Feira's version of events), and not going home when told to do so by Carlock.  Sample claims she did not know of the policy before she came to work on the 13th; though she does not dispute that Feira made her aware of the policy that morning and gave her an opportunity to go home, which she refused.  Sample does not dispute that Carlock told her to go home and change around 12:30 p.m., that she understood he meant for her to leave right away, or that she failed to leave when told to do so.  Sample does however claim she could not leave until her coworker returned from lunch.

-17-

At best, this evidence supports an inference the reasons given by Kern and Carlock for Sample's termination were pretextual, though it is difficult to see how this evidence goes any further than showing that Sample may have been punished too harshly.  Even if the Court assumes pretext in this case, pretext does not equal a violation under the FMLA.  Pretext merely shows Defendants terminated her for some other reason, it does not show what the actual reason was. To make her case that Carlock and Kern fired her to stop her from taking leave Sample relies on Carlock's statement to Maxwell "to get the FMLA book out and keep it out because there were so many pregnant women."  It is difficult to discern what a statement made six months prior to her termination would show on the issue of whether she would have been fired if she had not requested leave.  However, suppose such a statement, by itself, would support an inference that Carlock was frustrated or upset by women taking leave under the FMLA.  There is still uncontroverted evidence that nine of seventy-six employees in Sample's employment category were pregnant in 2003.  Even assuming Sample did in fact sufficiently notify the College of her intention to take FMLA leave, the remaining eight pregnant women that year requested and received FMLA leave.  Carlock himself approved the leave for five of those eight. An inference that Carlock and Kern cooked up a scheme to deprive Sample of her right to take leave is simply unwarranted in face of the fact every other women who requested leave that year received it.  Under these facts Sample has failed to show she was entitled to take leave by a preponderance of the evidence.  Therefore, Defendants' Motion for Summary Judgment on this Count is **GRANTED** and this claim is **DISMISSED with prejudice**.

### C.      Retaliation and Discrimination for Exercise of FMLA Rights

In Count III, Sample claims Defendants retaliated against her for exercising her rights

under the FMLA.  Essentially, she claims Defendants fired her for requesting FMLA leave.  The analysis here is somewhat different from the analysis of the previous Count.  In this Count, the question of Defendants' intent is relevant, and the issue before the Court is whether Sample's termination was motivated by an impermissible retaliatory or discriminatory animus.  *King*, 166 F.3d at 891.  Sample has not offered direct evidence in support of her retaliation claims.  Thus, as with her pregnancy discrimination claim, this Court employs the *McDonnell Douglas* framework in addressing her retaliatory discharge claim.  To make her prima facie case, Sample must establish that she engaged in a protected activity, the Defendants took adverse action, and there is a causal connection between Sample's request and her termination. *Id*. at 892.  To demonstrate this causal connection, Sample must show Defendants would not have fired her but for her request for leave.  *Id.*

Sample offers evidence similar to that offered in her previous claims in support of this claim.  In addition, she argues whether Defendants relied on Feira's memo (regarding her conversation with Sample on the matter of sick leave) or whether Feira and Kern met to discuss Sample's statements are disputed material facts.  Sample also cites a statement made by Kern in his deposition where he basically said he did not care what Sample actually said in her conversation with Feira.  Defendants claim they did not terminate her in retaliation for her request to take leave and offer as support for this claim that Shadowens, another pregnant female, replaced her at the retail store.  In addition, Defendants claim Sample did not engage in protected activity because she did not give Defendants sufficient notice of her intention to take maternity leave.

The protective activity prong of Sample's prima facie case is not as simple as it may seem.  As this Court reasoned concerning Sample's third claim, she did engage in protected activity by giving notice of her intention to take maternity leave.[1]  However, this Court also found Sample failed to meet her burden of demonstrating she was entitled to take the leave requested.  The threshold question therefore becomes whether it is consistent for this Court to find Defendants did not deprive Sample of her substantive right under the FMLA and still address whether Defendants discriminated against her for requesting leave.  It seems because Sample failed to show Defendants would not have terminated her had she not requested leave she could not show Defendants discriminated against her for requesting such leave.  Though this inquiry seems mooted by the Court's decision on Count III, the Court will nonetheless assume Sample engaged in protective activity for purposes of her discrimination claim.  The adverse action prong of her prima facie case is satisfied because Defendants terminated Sample.  Thus, the issue is whether there was a causal connection between Sample's request and her termination.

Sample has presented evidence that Defendants punished her too harshly.  Sample may even have made a case the reasons given by Defendants were pretextual.  However, the only evidence presented by Sample that remotely suggests Defendants terminated her for requesting FMLA leave is the oft-mentioned statement by Carlock.  As the Court has harped, this statement has little if any bearing on whether Defendants would have terminated her if she had not requested leave.  The only support for a causal connection is that Defendants terminated Sample six months after she requested leave.  In logic, it is axiomatic that temporal succession does not

---

[1] As with the previous claim, the Court finds the notice requirement of the FMLA claim a disputed issue of material fact, and, in dealing with this argument will assume Sample provided sufficient notice.

imply a causal relation.  Without more, this evidence shows very little.

It has often been said that one should not make unnecessary assumptions in support of a complex explanation when a much simpler explanation makes those assumptions unnecessary. Sample's theory of this case requires one to hypothesize a grand scheme orchestrated by Kern and Carlock to not pay the maternity leave of one employee.  To accomplish this Kern and Carlock waited six months after Sample notified Carlock of her pregnancy to find a pretext for firing her.  When Sample wore shorts to work on August 13th, Carlock and Kern had the excuse they needed and fired her.  To cover their tracks, Kern and Carlock let a pregnant woman who planned to take paid FMLA leave manage the store for two months by herself.  Perhaps if Sample had put forth some evidence to show that Defendants terminated her to get out of paying her FMLA benefits such assumptions might be warranted.  In the absence of such evidence an inference that Carlock and Kern fired Sample in retaliation for requesting leave is unwarranted. Therefore, Defendants' Motion for Summary Judgment on this Count is **GRANTED** and this claim is **DISMISSED with prejudice**.

### D.     Breach of Contract

Sample alleges in Count IV Defendants breached her contract when they terminated her. Defendants respond by denying Sample's employment was governed by an employment contract and claim that even if such a contract existed, Sample's conduct warranted her termination.  It is undisputed that Sample's last written contract expired June 30, 2003.  Her last contract contained the following language: "This contract is for the effective dates only and does not imply continued employment in the position after the final effective date."  It is also undisputed that Sample did not receive written or verbal assurance of future employment from Defendants.

-21-

Nonetheless, Sample claims she had a contract.  She supports this claim with various evidence. First, Sample points the Court to the fact she did not receive her contract for the period from July 1, 2002, to June 30, 2003, until April 11, 2003.  Sample testified the lag in receiving her written contract was due to the fact the College was negotiating with the union and it did not give written contracts to its employees until it completed those negotiations.  Sample also claims the fact that the College allowed her to utilize its grievance procedures shows there was a contract governing her employment. Finally, she claims whether sufficient cause existed to justify her termination is a question of fact for the jury.

Clearly, no written contract governed Sample's employment when the College terminated her. Sample's last contract, the contract which expired June 30, 2003, cannot be construed to govern her employment during the month of August.  The language of that contract, by express and clear terms, made it apparent that continued employment was not to be implied from it.  This Court will not consider extrinsic evidence to interpret an clear an unambiguous contract.  *Geier v. Medtronic, Inc.*, 99 F.3d 238, 244 (7th Cir. 1996).  As such, to the extent Sample claims a contractual right stemming from her last written contract, such claim is without merit.

Sample also claims she was working under a contract implied in fact.  Under Illinois law, an implied in fact contract is one which arises from acts or circumstances indicating the parties' mutual intention.  *Citizens Bank-Illinois, N.A. v. American Nat. Bank and Trust Co. of Chicago*, 326 Ill.App. 3d 822, 260 Ill.Dec. 431, 761 N.E.2d 275, 282 (Ill.App.Ct. 1 Dist. 2001); *U.S. Fidelity and Guar. Co. v. Continental Cas. Co.*, 198 Ill.App. 3d 950, 135 Ill.Dec. 53, 556 N.E.2d 671, 676 (Ill.App.Ct. 1 Dist. 1990).  A contract implied in fact often arises from an established course of dealing between the parties.  *Greenview Ag Center, Inc. v. Yetter Mfg. Co.*, 246

-22-

Ill.App. 3d 132, 185 Ill.Dec.836, 615 N.E.2d 395, 398-99 (Ill.App.Ct. 4 Dist.1993).  In this case

there is sufficient evidence from which a reasonable juror could infer that a contract existed

between the College and Sample.  Over the years, Sample regularly received her written

contracts some time after their effective dates: she received her contract covering fiscal year

1999 approximately forty-five days after its effective date, her 2000 contract approximately

twenty days after its effective date and her 2003 contract approximately eight months after its

effective date.  A contract governed her employment from the first day she began working for

the College until her last written contract expired on June 30, 2003.  Sample also testified the

College was waiting for union negotiations to be completed before it sent the contracts to its

employees.  A reasonable juror could conclude that an implied in fact contract existed when she

was terminated.

Defendants claim they had sufficient cause to terminate Sample even if an implied

contract governed her employment.  Section 3.17 of the College's Board Policy Manual states

that a non-tenured Academic Support employee (such as Sample) may be terminated "during the

term of his/her contract or appointment if there is a breach of contract sufficient to justify

termination."  Under Illinois law, whether a party has breached a contract is a question of fact.

*Meade v. Kubinski*, 277 Ill.App. 3d 1014, 214 Ill.Dec.733, 661N.E.2d 1178, 1185-86 (Ill.App.Ct.

3 Dist. 1996); *Israel v. National Canada Corp.*, 276 Ill.App.3d 454, 213 Ill. Dec.163, 658 N.E.2d

1184, 1190 (Ill.App.Ct. 1 Dist. 1995).  Construing the evidence in the light most favorable to

Sample, reasonable persons could disagree as to whether Sample's actions merited her

termination.  Given the disputed nature of Sample's conversation with Feira, Sample's

knowledge of the implementation of the new dress code and Sample's excuses for not going

home when offered/told by Feira and Carlock, whether there was a breach of the employment contract sufficient to justify Sample's termination is properly a question for the jury. Defendants' Motion for Summary Judgment on this Count is **DENIED**.

### E.      § 1983 Due Process Claims

In her final claim, Sample argues the manner in which she was terminated violated due process.  She claims she was not afforded "meaningful" pre- and post-deprivation termination hearings. To establish a due process violation, Sample must show "(1) the existence of a cognizable property interest; (2) deprivation of that interest; and (3) a denial of due process. *Licari v. City of Chicago*, 298 F.3d 664, 668 (7th Cir. 2002).  The right of an employee not to be fired during the period of her contract without cause is a cognizable property interest.  *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 709 (7th Cir. 2004).  As this Court found with regard to Count IV, there is a genuine issue of material fact as to the existence of a contract in this case.  For purposes of this claim, the Court will assume such a contract was in place.  As Sample was terminated, the question becomes whether she was denied due process.

Assuming the existence of a contract in this case, Sample was entitled to certain pre-termination procedures, including at a minimum: notice of the charges against her, either written or oral, an explanation of the College's evidence and an opportunity for her to tell her side of the story. *Head v. Chicago School Reform Bd. of Trs.*, 225 F.3d 794, 803-04 (7th Cir. 2000).  It is undisputed that the College gave Sample notice of the charges against her, explained the evidence against her and gave her an opportunity to tell her side of the story.  Sample claims, however, these proceedings were constitutionally inadequate because the decisionmaker was not impartial.

Sample correctly notes she was entitled to an impartial decisionmaker at her pre-termination hearing. *Id.* at 804. Her argument on this issue is confusing though, because her claims of alleged impartiality are focused on Kern and Carlock.  Kern and Carlock did not preside over her hearing, the Board did, and as the adjudicators in that hearing, they are presumed to have acted honestly and in good faith. *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).  To overcome this presumption, Sample must present substantial evidence of actual or potential bias, such as evidence of a financial interest in the proceeding, personal animosity or actual prejudgment of her case. *Head*, 225 F.3d at 804 (citing *Withrow*, 421 U.S at 47).  Sample claims the Board's involvement in her termination was a facade because of the influence Kern held over the Board.  To support this claim she points to the fact the Board generally approves Kern's recommendations and that Kern directed them not to direct questions to Sample for fear of use in future litigation.  This evidence is insufficient to overcome the presumption in favor of the Board.  Sample presents no evidence of the kind outlined in *Head*. That the Board routinely approves Kern's recommendations does not necessarily mean they had already decided on the outcome of Sample' case.  Similarly, the Board's failure to question Sample does not imply it had prejudged her case.  One Board member, Joseph Bonan, testified he did not make his decision to vote in favor of termination until he heard the evidence at the hearing.  Another Board member, Courtney Cox, and the student trustee (though his vote did not count) voted against the recommendation for termination.  In light of this evidence and the lack of any other evidence showing prejudgment or bias on the part of the Board, Sample has failed to overcome the presumption of the Board's good faith.

Sample also claims her post-deprivation procedures were constitutionally insufficient because Carlock and Kern were impartial, and therefore unsuitable to hear her post-termination grievance.  In accordance with the College's grievance procedure, Sample sent Carlock a grievance letter on August 29, 2003, approximately a week after her termination.  She then met with Affirmative Action Officer Kim Rodgers, Dean of Special Programs Andrea Witthoft and Carlock to discuss her grievance on September 8th; after this meeting Carlock denied her grievance.  Sample appealed this decision to Kern, who met with her and denied her grievance.  Eventually, Sample grieved her termination to the Board and the Board denied her grievance on November 24, 2003.

Sample claims Carlock and Kern were biased against her and therefore their role in her grievance made the procedure constitutionally insufficient.  Kern, Carlock and the Board are entitled to the same presumption of impartiality as that given the Board with regard to the pre-termination hearing, and Sample must present sufficient evidence to overcome it.  Evidence of Kern and Carlock's involvement in Sample's termination is not sufficient, by itself, to overcome the presumption. *Head*, 225 F.3d at 804.  In this case, Kern and Carlock were instrumental in Sample's termination from the very beginning.  It was Kern who first heard of Sample's failure to comply with the policy and it was Kern who sent Carlock to investigate.  Carlock investigated Sample, told her to go home and eventually suspended her.  At the direction of Kern, Carlock also investigated Sample's conversation with Feira, and reported back Feira's version of that conversation, a conversation that was obviously important to Kern's eventual determination of insubordination.  Carlock and Kern met with Sample to hear her side of the incident.  Finally, Kern presented the facts of the incident and made his recommendation of termination to the

Board.  Kern and Carlock were intimately involved in Sample's termination from the very beginning.  In his deposition, Kern testified he did not "believe for a second – [Sample] could claim she didn't know the [dress code] policy was in effect."  This statement clearly shows Kern had already determined Sample made a willful violation of the dress policy.  One is left to wonder what the purpose an appeal of her grievance to Kern would serve when he had already recommended her termination and determined she willfully violated the policy.  Sample, however, was left to grieve her termination to the same supervisor that suspended her and the same administrator who recommended her suspension and presented his case to the Board.  Given the level of involvement of Kern and Carlock in the incident underlying Sample's termination, a jury could reasonably find Kern and Carlock were not impartial in post-termination grievance procedures.  Therefore, Defendant's Motion for Summary Judgment on this Count is **DENIED**.

>    **CONCLUSION**
>
>    1.    Defendants' Motion for Summary Judgment on Count I is **GRANTED** and this claim is **DISMISSED with prejudice.**
>
>    2.    Defendants' Motion for Summary Judgment on Count II is **GRANTED** and this claim is **DISMISSED with prejudice.**
>
>    3.    Defendants' Motion for Summary Judgment on Count III is **GRANTED** and this claim is **DISMISSED with prejudice.**
>
>    4.    Defendants' Motion for Summary Judgment on Count IV is **DENIED.**
>
>    5.    Defendants' Motion for Summary Judgment on Count V is **DENIED.**

The **Clerk of the Court** shall **ENTER JUDGMENT** accordingly at the end of this case.

**IT IS SO ORDERED.**

**Dated: October 5, 2005.**

___/s/ J. Phil Gilbert_____
**J. PHIL GILBERT**
**U.S. District Judge**
